FILED
CLERK, U.S. DISTRICT COURT
JAN 13 2011
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2010 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>MIGUEL ESTRADA,<br>aka "Stranger,"<br>BALDEMIRO ULLOA,<br>aka "Pana,"<br>CESAR FACIO,<br>aka "Tamal,"<br>MARCO RUIZ NARIO,<br>aka "Tony,"<br>aka "Sniper,"<br>JOSE MANUEL GONZALEZ,<br>aka "Cyclone,"<br>CESAR ENRIQUE BARREIRO,<br>aka "Weasel,"<br>JORGE ARTURO HERCULES,<br>aka "Joker,"<br>aka "Trouble,"<br>ELENA MARTINEZ,<br>DONALD SALAZAR, JR.,<br>aka "Junior,"<br>ALEJANDRO SEPULVEDA ARMENTA,<br>aka "Trini,"<br>SANTIAGO LARIOS RODRIGUEZ,<br>JOE MARTINEZ,<br>aka "Scrappy,"<br>ROBERT VELARDEZ,<br>MARIA HERNANDEZ, and<br>DANTE HURTADO,<br><br>Defendants. | No. ~~CR 10-~~ CR 11 00029<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. § 1959(a)(3): Violent Crimes in Aid of Racketeering; 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute, Distribute, and Aid and Abet the Distribution of Controlled Substances; 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii): Distribution and Possession with Intent to Distribute Methampethamine; 21 U.S.C. § 853: Criminal Forfeiture] |

The Grand Jury charges:

**INTRODUCTORY ALLEGATIONS**

A. **THE RACKETEERING ENTERPRISE**

At all times relevant to this Indictment:

1. Defendants MIGUEL ESTRADA, also known as ("aka") "Stranger" ("ESTRADA"), BALDEMIRO ULLOA, aka "Pana" ("ULLOA"), CESAR FACIO, aka "Tamal" ("FACIO"), MARCO RUIZ NARIO, aka "Tony," aka "Sniper" ("NARIO"), JOSE MANUEL GONZALEZ, aka "Cyclone" ("J. GONZALEZ"), and CESAR ENRIQUE BARREIRO, aka "Weasel" ("BARREIRO"), and others known and unknown to the Grand Jury, were members and associates of Lennox 13, otherwise known as L13 or L-13 (hereinafter referred to as "L-13"), a criminal organization whose members and associates engage in numerous acts of violence and other crimes, including extortion, drug trafficking, robbery, assault, obstruction of justice, and witness tampering. At all relevant times, L-13 operated in the Central District of California and elsewhere.

2. L-13, including its leadership, membership, and associates, constitutes an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise is engaged in, and its activities affect, interstate and foreign commerce.

3. Defendants ESTRADA, ULLOA, FACIO, NARIO, J. GONZALEZ, and BARREIRO, and others known and unknown to the Grand Jury,

participated in the operation, organization, and leadership of L-13.

B. GENERAL BACKGROUND

At all times relevant to this Indictment:

4. The Lennox gang was formed in Los Angeles, California, in the mid-1960s by Mexican-American individuals living in the Lennox area of unincorporated Los Angeles County. The number "13," which stands for the letter "M," the 13th letter of the alphabet, was added to the gang's name in the 1990s, when L-13 became associated with the Mexican Mafia. The Mexican Mafia, commonly referred to as "la EME" (which translates in English as "the M"), is a criminal organization that operated within the prison system and exercises control over the Hispanic street gangs of Southern California.

5. Over the years, L-13 had grown in membership and increased its criminal activity. L-13 operated a Southern California criminal organization, consisting of approximately 650 members in total, and with approximately 250 members regularly conducting criminal activities.

6. In Los Angeles, L-13 operated primarily within an area bounded by Century Boulevard to the north, Hawthorne Boulevard to the east, Imperial Highway to the south, and La Cienega Boulevard to the west. L-13 also maintained members in other parts of Los Angeles County.

7. L-13 typically added new members through an initiation ritual known as being "jumped in," during which several existing gang members beat up a prospective member for thirteen seconds.

Once "jumped in," a gang member is expected to participate fully in L-13's criminal activity.

8. L-13 members were aided in their criminal endeavors by other trusted individuals, referred to herein as "associates," who participate in the various activities of the enterprise with its members. L-13 was lead by high-ranking gang members, herein "shotcallers." L-13 enforced its rules and promoted discipline among its members and associates by threatening and committing acts of violence against those members and associates of the enterprise who violated the rules of, or posed a threat to, the enterprise. L-13 members also engaged in acts of violence against innocent citizens in the gang's territory and against rival gang members. A member who participated in violent acts directed by the gang leadership or in the presence of other gang members particularly increased the respect accorded that member and resulted in that member maintaining or increasing his position in L-13. In addition, violent acts committed by L-13 members enhanced the gang's overall reputation for violence in the community, resulting in the intimidation of citizens in L-13 territory and the reinforcement of the gang's control of those areas of Los Angeles County in which it operated.

9. Members of L-13 frequently, though not always, signified their membership in the gang with tattoos reading "Lennox," "LNX," "Nox," "L-13," or other variations of the gang's name. L-13 members frequently referred to one another by gang monikers, or nicknames, and often do not know fellow gang members' legal names.

10. Drug sales provided the bulk of L-13's profits. In the gang territory, the drugs are supplied by a wholesaler, and were usually, but not always, sold on the street by street-level dealers who are allowed to sell drugs within the gang's territory on the condition that they pay regular "rent" to the gang. Non-member associates of L-13 were also used to distribute drugs to the street-level dealers and collect rent (commonly referred to as a "tax"). Gang members provided protection to the street-level drug dealers from robbers and competitors. Drug dealers who violated this arrangement were subject to reprisals, including threatened and actual acts of violence.

11. Profits were also generated from routine extortions of legitimate food vendors and other business owners operating within L-13 territory, robberies, as well as from additional miscellaneous crimes committed by L-13 members. Members were expected to contribute a portion of the proceeds of their crimes to the gang. In addition to generating profits, these crimes of intimidation also furthered the enterprise by establishing and maintaining L-13's control over its territory by instilling fear in the populace.

12. L-13 contributed a portion of its profits towards a tax paid by L-13 to the Mexican Mafia. Like all gangs associated with the Mexican Mafia, L-13 was required to pay a specified sum of money on a regular basis to a member of the Mexican Mafia. Members of the Mexican Mafia are commonly referred to as "big homies," "tios" (Spanish for "uncles"), "carnals" (Spanish slang for "brothers"), and/or "señors" (a Spanish title of respect for a man). In return for the tax payments, the Mexican Mafia

provided protection to all L-13 members incarcerated in California and federal prisons. Failure to pay the tax will result in a "green light" being placed on L-13, that is, a general order from the Mexican Mafia to assault or kill any incarcerated L-13 member in any facility controlled by the Mexican Mafia. Also in return for these tax payments, the Mexican Mafia ensured that no other gang operates in L-13's territory or otherwise interfered with the criminal activities of L-13.

13. Since the 1990s, when L-13 became associated with the Mexican Mafia, a single powerful L-13 member in Los Angeles had been appointed to act as L-13's representative to the Mexican Mafia ("the EME representative"). The EME representative worked as a "soldier" for the Mexican Mafia and was responsible for, among other things, ensuring that L-13 pays its tax; setting policies to manage and discipline L-13 members and associates; organizing and conducting meetings among L-13 shotcallers on a regular basis; resolving disputes between L-13 and other gangs; and organizing L-13 members to generate money through, among other things, drug trafficking.

14. In addition to the tax paid to the Mexican Mafia, L-13 utilized the profits obtained through its illegal activities by purchasing weapons and drugs, paying attorney's fees for gang members who have been charged with committing crimes, contributing to funeral costs for gang members who have been killed, and putting money on the prison accounts of incarcerated L-13 members.

C. DEFENDANTS AND CO-CONSPIRATORS

At all times relevant to this Indictment:

15. Defendants ESTRADA and ULLOA were shotcallers of L-13, and defendants FACIO, NARIO, J. GONZALEZ, BARREIRO, Jorge Arturo Hercules, aka "Joker," aka "Trouble" ("Hercules"), Joe Martinez, aka "Scrappy" ("J. Martinez"), and Dante Hurtado ("Hurtado"), were members of L-13.

16. Defendants Elena Martinez ("E. Martinez"), Donald Salazar, Jr., aka "Junior" ("Salazar"), Alejandro Sepulveda Armenta, aka "Trini" ("Armenta"), Santiago Larios Rodriguez ("S. Rodriguez"), Robert Velardez ("Velardez"), and Maria Hernandez ("M. Hernandez") were co-conspirators involved in the L-13 drug trafficking conspiracy described in this Indictment.

D. PURPOSES OF THE ENTERPRISE

17. The purposes of the enterprise, namely, L-13, included, but were not limited to, the following:

a. Enriching the members and associates of the enterprise through, among other things, the sale and distribution of drugs and the collection of rent from drug traffickers and legitimate and illegitimate business persons operating within its territory;

b. Preserving and protecting the power, territory, and profits of the enterprise, its members and associates, through threats of violence and actual acts of violence, including assault and robbery;

c. Promoting and enhancing the enterprise and the activities of its members and associates;

d. Providing assistance and protection to other

members of the enterprise, including by intimidating witnesses cooperating with law enforcement against members of the enterprise.

E. <u>MEANS AND METHODS OF THE ENTERPRISE</u>

18. Among the means and methods by which the defendants and other members and associates of the enterprise conduct and participated in the conduct of the affairs of the enterprise were the following:

a. Members and associates of the enterprise conspired to commit, commit, and attempt to commit acts of violence, in order to protect and expand the enterprise's criminal operations;

b. Members and associates of the enterprise acquired, possessed, carried, and used deadly weapons, including firearms, in the course of the enterprise's criminal activities;

c. Members and associates of the enterprise promoted a climate of fear in the community through threats of harm and violence;

d. Members and associates of the enterprise participated in drug trafficking, including the purchase and sale of cocaine base in the form of crack cocaine ("crack cocaine"), powder cocaine, crystal methamphetamine, marijuana, and other controlled substances;

e. Members and associates extorted local drug dealers operating within the enterprise's territory, and extorted local business owners operating within the enterprise's territory, under threat of violence if such individuals refused to make payment;

f. Members and associates of the enterprise used various techniques to avoid law enforcement scrutiny of the enterprise's criminal activities and to evade and frustrate law enforcement's ability to investigate the criminal activities of the enterprise, such as the use of coded language to discuss criminal activities and other counter-surveillance techniques; and

g. Members and associates of the enterprise frustrated investigations of their criminal conduct by, among other things, attempting to destroy evidence and intimidating witnesses through threats of violence and actual violence, including assault.

COUNT ONE

[18 U.S.C. § 1962(d)]

Paragraphs One through Eighteen of the Introductory Allegations of this Indictment are realleged and incorporated by reference as though fully set forth herein.

THE RACKETEERING CONSPIRACY

Beginning on a date unknown to the Grand Jury, but at least by 2002, and continuing until in or around January 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants ESTRADA, ULLOA, FACIO, NARIO, J. GONZALEZ, and BARREIRO, and others known and unknown to the Grand Jury, being persons employed by and associated with L-13, which constitutes an "enterprise," as defined in Title 18, United States Code, Section 1961(4), which enterprise affected interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts indictable under:

A. Title 18, United States Code, Section 1951 (interference with commerce by threats or violence);

B. Title 18, United States Code, Section 1512 (witness tampering);

and multiple acts involving robbery and extortion, chargeable under the following provisions of state law:

C. California Penal Code Sections 31, 664, and 211-213 (robbery);

D. California Penal Code Sections 31, 182, and 518-20 (extortion);

and multiple acts involving the distribution of controlled substances including cocaine, crack cocaine, methamphetamine, and marijuana, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

It was further a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

A. <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED</u>

The object of the conspiracy was to be accomplished, in substance, as follows:

1. Defendants ESTRADA and ULLOA, and others known and unknown to the Grand Jury, would direct the drug trafficking and other racketeering activities of the L-13 criminal enterprise.

2. Defendants ESTRADA, ULLOA, and FACIO collected and distributed "taxed" drug proceeds, as well as and other money extorted from local drug dealers operating in the L-13 criminal enterprise's territory and those involved in the commission of crimes of violence in that territory.

3. Defendants ULLOA, FACIO, and NARIO, and other drug suppliers, would obtain controlled substances that were then distributed to members and associates of the L-13 criminal enterprise.

4. Defendants ESTRADA and ULLOA, and others known and unknown to the Grand Jury, would permit drug traffickers to distribute drugs in the geographic area controlled by the L-13 criminal enterprise in return for a percentage of the drug proceeds that were obtained from drug sales in the areas controlled by the L-13 criminal enterprise.

5. Defendants ESTRADA and ULLOA, and others known and unknown to the Grand Jury, would extort money from business owners who operated in the areas controlled by the L-13 criminal enterprise.

6. Defendants ESTRADA, ULLOA, J. GONZALEZ, BARREIRO, and Hercules, and others known and unknown to the Grand Jury, would commit, or threaten to commit, or authorize the commission of, acts of violence in order to maintain control over the L-13 criminal enterprise's territory.

B. OVERT ACTS

In furtherance of the conspiracy, and to accomplish the object of the conspiracy, defendants ESTRADA, ULLOA, FACIO, NARIO, J. GONZALEZ, and BARREIRO, and others known and unknown to the Grand Jury, committed various overt acts, on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1. On or about July 9, 2006, defendants J. GONZALEZ and BARREIRO and unindicted co-conspirators attacked victim C.G. with a baseball bat and vandalized C.G.'s automobile.

2. On or about July 9, 2006, defendants J. GONZALEZ and BARREIRO and unindicted co-conspirators attempted to strike victim J.T. with a baseball bat and brandished a firearm in the

vicinity of the 3000 block of 134th Street in Hawthorne, California.

3. On or about July 9, 2006, defendants J. GONZALEZ and BARREIRO and unindicted co-conspirators robbed victim J.T. of his cell phone in the vicinity of the 3000 block of 134th Street in Hawthorne, California.

4. On or about September 2, 2009, in the vicinity of Lennox Park in Los Angeles, California, defendant ULLOA demanded tax money from a confidential source ("CS1") through the use of force and fear, and in return for protection from L-13 that would allow CS1 to engage in criminal activity in the area controlled by the L-13 criminal enterprise.

5. On or about September 14, 2009, defendant ULLOA collected tax money from CS1 through the use of force and fear.

6. On or about September 16, 2009, defendant ULLOA agreed to sell one ounce of methamphetamine to CS1 in the vicinity of Lennox Park in Los Angeles, California.

7. On or about September 30, 2009, defendants J. GONZALEZ and BARREIRO attacked and robbed victim R.A., taking away R.A.'s handgun, in the vicinity of the 10600 block of Inglewood Avenue in Los Angeles, California.

8. From on or about September 30, 2009 to on or about October 15, 2009, in the vicinity of the 10600 block of Inglewood Avenue in Los Angeles, California, unknown co-conspirators warned victim R.A. not to cooperate with law enforcement and testify against defendants J. GONZALEZ and BARREIRO after defendants J. GONZALEZ and BARREIRO had attacked and robbed R.A.

9. On or about November 24, 2009, defendant ULLOA distributed approximately 38 pills containing hydrocodone to an unindicted co-conspirator in the vicinity of the 4500 block of West 111th Street in Los Angeles, California.

10. On or about December 3, 2009, defendant ESTRADA demanded tax money under threat of force and fear from a business owner.

11. On or about December 26, 2009, defendants ESTRADA and ULLOA discussed over the telephone, using coded language, taxing a drug dealer.

12. On or about December 28, 2009, defendant ESTRADA agreed over the telephone, using coded language, to sell $105 worth of drugs to defendant ULLOA.

13. On or about December 30, 2009, defendant ESTRADA, in a telephone conversation using coded language, agreed to purchase $12,000 worth of methamphetamine from an unindicted co-conspirator.

14. On or about January 2, 2010, defendant FACIO possessed approximately 1.26 grams of methamphetamine and approximately .23 grams of powder cocaine ("cocaine") in the vicinity of the 10700 block of Inglewood Avenue in Los Angeles, California.

15. On or about January 4, 2010, in a telephone conversation using coded language, defendant ESTRADA demanded taxes under threat of force and fear from an unindicted co-conspirator.

16. On or about January 15, 2010, in a telephone conversation using coded language, defendant FACIO offered to

sell one ounce of methamphetamine for $1,100 to another confidential source ("CS5").

17. On or about January 15, 2010, defendant FACIO possessed approximately 3.5 grams of methamphetamine and approximately 2.3 grams of cocaine in the vicinity of the 11400 block of Hawthorne Boulevard, in Hawthorne, California.

18. On or about January 20, 2010, in a telephone conversation using coded language, defendant ULLOA agreed to distribute one ounce of methamphetamine to CS5 in exchange for $1,500.

19. On or about January 21, 2010, defendant Armenta, in a telephone conversation using coded language, agreed to sell one ounce of methamphetamine to defendant ULLOA.

20. On or about January 26, 2010, in a telephone conversation using coded language, defendant ULLOA discussed distributing methamphetamine with CS5.

21. On or about January 27, 2010, defendants ULLOA and Armenta distributed approximately 26.7 grams of methamphetamine to CS5 in exchange for $1,300.

22. On or about February 1, 2010, in a telephone conversation using coded language, defendant ULLOA discussed the distribution of three ounces of methamphetamine with CS5.

23. On or about February 12, 2010, defendant ESTRADA obtained tax money under threat of force and fear from a business owner.

24. On or about February 12, 2010, defendant ESTRADA attempted to influence the testimony of victim R.A. by

threatening violence toward victim R.A. to an acquaintance of R.A.

25. On or about February 14, 2010, in a telephone conversation using coded language, defendant FACIO agreed to distribute $40 worth of cocaine to an unindicted co-conspirator.

26. On or about February 17, 2010, defendants ESTRADA and FACIO, in a telephone conversation using coded language, discussed taxing L-13's extortion victims and using the tax money to purchase firearms.

27. On or about February 18, 2010, defendant FACIO, in a telephone conversation using coded language, discussed taxing a business with an unindicted co-conspirator.

28. On or about February 20, 2010, defendant FACIO, in a telephone conversation using coded language, discussed taxing a drug dealer with an unindicted co-conspirator.

29. On or about February 20, 2010, defendant FACIO, in a telephone conversation using coded language, discussed taxing a business with the business's employee.

30. On or about February 21, 2009, defendant ULLOA, in a telephone conversation using coded language, agreed to distribute methamphetamine to an unindicted co-conspirator.

31. On or about February 22, 2010, in a telephone conversation using coded language, defendant Armenta agreed to sell drugs to defendant ULLOA.

32. On or about February 25, 2010, defendant FACIO and an unindicted co-conspirator discussed, in a telephone conversation using coded language, a drug transaction involving approximately one-quarter of a kilogram of cocaine.

33. On or about February 27, 2010, in a telephone conversation using coded language, defendant FACIO agreed to distribute approximately $100 dollars worth of cocaine.

34. On or about March 1, 2010, defendant NARIO, in a telephone conversation using coded language, agreed to distribute one-half ounce of cocaine to defendant FACIO, and FACIO agreed by telephone to turn the cocaine into crack cocaine for NARIO.

35. On or about March 5, 2010, in a telephone conversation using coded language, defendant NARIO agreed to sell cocaine to defendant FACIO.

36. On or about March 9, 2010, defendant ULLOA, in a telephone conversation using coded language, agreed to distribute methamphetamine and cocaine with an unindicted co-conspirator.

37. On or about March 12, 2010, defendant FACIO, in a telephone conversation using coded language, discussed turning cocaine into crack cocaine with an unindicted co-conspirator.

38. On or about March 23, 2010, defendant FACIO, in a telephone conversation using coded language, discussed distributing one ounce of cocaine with an unindicted co-conspirator.

39. On or about March 23, 2010, defendants FACIO and NARIO, in a telephone conversation using coded language, discussed distributing one ounce of cocaine to an unindicted co-conspirator.

40. On or about March 25, 2010, defendant NARIO, in a telephone conversation using coded language, agreed to distribute one ounce of cocaine to defendant FACIO.

41. On or about March 25, 2010, defendants FACIO and M. Hernandez, in a telephone conversation using coded language, discussed selling crack cocaine, and M. Hernandez agreed to make $750 worth of crack cocaine from cocaine.

42. On or about March 26, 2010, defendants FACIO and E. Martinez agreed to distribute $40 worth of drugs to an unknown individual.

43. On or about March 26, 2010, defendant FACIO and an unindicted co-conspirator, in a telephone conversation using coded language, agreed to sell cocaine and discussed turning cocaine into crack cocaine.

44. On or about March 26, 2010, in a telephone conversation using coded language, defendant FACIO agreed to sell methamphetamine to an unindicted co-conspirator.

45. On or about March 26, 2010, defendants FACIO and M. Hernandez, in a telephone conversation using coded language, discussed turning cocaine into crack cocaine.

46. On or about March 27, 2010, defendant NARIO, in a telephone conversation using coded language, agreed to sell cocaine to defendant FACIO.

47. On or about March 29, 2010, defendant NARIO, in a telephone conversation using coded language, agreed to distribute one-half ounce of cocaine to defendant FACIO.

48. On or about March 30, 2010, defendant NARIO, in a telephone conversation using coded language, agreed to sell one ounce of cocaine to defendant FACIO.

49. On or about April 3, 2010, defendants FACIO and E. Martinez, in a telephone conversation using coded language, discussed purchasing controlled substances.

50. On or about April 5, 2010, defendant FACIO possessed approximately 1.3 grams of cocaine in the vicinity of the Imperial Highway at the 405 Freeway, in Los Angeles, California.

51. On or about April 7, 2010, in a telephone conversation using coded language, defendants FACIO and E. Martinez discussed the distribution of cocaine.

52. On or about April 9, 2010, defendant NARIO, in a telephone conversation using coded language, agreed to distribute cocaine to defendant FACIO.

53. On or about April 10, 2010, defendant FACIO possessed approximately .74 grams of methamphetamine, approximately 3.27 grams of cocaine, and approximately 2.9 grams of marijuana in the vicinity of the 10700 block of Inglewood Avenue in Los Angeles, California.

C. GENERAL ALLEGATIONS

1. Beginning on a date unknown to the Grand Jury, but certainly no later than in or around 2005, and continuing until in or around January 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants ESTRADA, ULLOA, and FACIO, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a. To possess with intent to distribute, distribute, and aid and abet the distribution of at least five kilograms of a mixture or substance containing a detectable amount of cocaine, a

Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(ii);

b. To possess with intent to distribute, distribute, and aid and abet the distribution of at least 500 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(B)(ii);

c. To possess with intent to distribute, distribute, and aid and abet the distribution of at least 280 grams of a mixture or substance containing a detectable amount of crack cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(iii);

d. To possess with intent to distribute, distribute, and aid and abet the distribution of at least 28 grams of a mixture or substance containing a detectable amount of crack cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(B)(iii);

e. To possess with the intent to distribute, distribute, and aid and abet the distribution of at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(viii); and

f. To possess with the intent to distribute, distribute, and aid and abet the distribution of at least five

grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(B)(viii).

COUNT TWO

[18 U.S.C. § 1959(a)(3) and 2]

1. At all times relevant to this Indictment, the L-13 gang, as more fully described in Paragraphs One through Nineteen of the Introductory Allegations of this Indictment, which are realleged and incorporated by reference as though set forth fully herein, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, although not a legal entity, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2. At all times relevant to this Indictment, the above-described enterprise, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, among other things, acts involving extortion, in violation of Title 18, United States Code, Section 1951; witness tampering, in violation of Title 18, United States Code, Section 1512; extortion, in violation of California Penal Code Sections 31, 182, and 518-20; attempted robbery and robbery, in violation of California Penal Code Sections 31, 664, and 211-13; and drug trafficking, in violation of Title 21, United States Code, Sections 846 and 841.

3. On or about July 9, 2006, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing their position in L-13, an enterprise engaged in racketeering activity, defendants JOSE MANUEL

GONZALEZ, also known as ("aka") "Cyclone" ("J. GONZALEZ"), and CESAR ENRIQUE BARREIRO, aka "Weasel" ("BARREIRO"), and others known and unknown to the Grand Jury, unlawfully and knowingly conspired to commit, and committed, an assault upon the person of another with a dangerous weapon, namely, defendants J. GONZALEZ and BARREIRO, and others, struck victim C.G. with a baseball bat in the vicinity of the 3000 block of 134th Street in Hawthorne, California, in violation of California Penal Code Sections 31 and 245(a)(1), all in violation of Title 18, United States Code, Section 1959(a)(3) and 2.

COUNT THREE

[18 U.S.C. § 1959(a)(6)]

1. Paragraphs One and Two of Count Two are hereby realleged and incorporated by reference as though fully set forth herein.

2. On or about July 9, 2006, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing their position in L-13, an enterprise engaged in racketeering activity, defendants JOSE MANUEL GONZALEZ, also known as ("aka") "Cyclone" ("J. GONZALEZ"), and CESAR ENRIQUE BARREIRO, aka "Weasel" ("BARREIRO"), and others known and unknown to the Grand Jury, attempted to commit an assault upon the person of another with a dangerous weapon, namely, defendants J. GONZALEZ and BARREIRO, and others, attempted to strike victim J.T. with a baseball bat in the vicinity of the 3000 block of 134th Street in Hawthorne, California, in violation of California Penal Code Sections 31 and 245(a)(1), all in violation of Title 18, United States Code, Section 1959(a)(6).

COUNT FOUR

[18 U.S.C. §§ 1959(a)(3) and 2]

1. Paragraphs One and Two of Count Two are hereby realleged and incorporated by reference as though fully set forth herein.

2. On or about February 24, 2009, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing their position in L-13, an enterprise engaged in racketeering activity, defendant JORGE ARTURO HERCULES, also known as ("aka") "Joker," aka "Trouble" ("HERCULES"), and others known and unknown to the Grand Jury, committed, and aided, abetted, counseled, commanded, induced, and procured the commission of, an assault upon the person of another with a dangerous weapon that resulted in serious bodily injury, namely, defendant HERCULES and others struck victim L.M. with a crowbar in the vicinity of the 3000 block of 134th Street in Hawthorne, California, in violation of California Penal Code Sections 31 and 245(a)(1), all in violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

COUNT FIVE

[18 U.S.C. § 1959(a)(6) and 2]

1. Paragraphs One and Two of Count Two are hereby realleged and incorporated by reference as though fully set forth herein.

2. On or about February 24, 2009, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing their position in L-13, an enterprise engaged in racketeering activity, defendant JORGE ARTURO HERCULES, also known as ("aka") "Joker," aka "Trouble" ("HERCULES"), and others known and unknown to the Grand Jury, attempted to commit an assault upon the person of another with a dangerous weapon, namely, defendant HERCULES and others attempted to strike victim S.V. with a crowbar, in the vicinity of the 3000 block of 134th Street in Hawthorne, California, in violation of California Penal Code Sections 245(a)(1), all in violation of Title 18, United States Code, Section 1959(a)(6) and 2.

COUNT SIX

[21 U.S.C. § 846]

Paragraphs Four through Fourteen of the Introductory Allegations are hereby realleged and incorporated by reference as though fully set forth herein.

A. OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, but certainly no later than in or around July 2009, and continuing until in or around January 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants MIGUEL ESTRADA, also known as ("aka") "Stranger" ("ESTRADA"), BALDEMIRO ULLOA, aka "Pana" ("ULLOA"), CESAR FACIO, aka "Tamal" ("FACIO"), MARCO RUIZ NARIO, aka "Tony," aka "Sniper" ("NARIO"), ELENA MARTINEZ ("E. MARTINEZ"), DONALD SALAZAR, JR., aka "Junior" ("SALAZAR"), ALEJANDRO SEPULVEDA ARMENTA, aka "Trini" ("ARMENTA"), SANTIAGO LARIOS RODRIGUEZ ("S. RODRIGUEZ"), JOE MARTINEZ, aka "Scrappy" ("J. MARTINEZ"), ROBERT VELARDEZ ("VELARDEZ"), MARIA HERNANDEZ ("M. HERNANDEZ"), and DANTE HURTADO ("HURTADO"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

1. To possess with intent to distribute, distribute, and aid and abet the distribution of at least five kilograms of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(ii);

2. To possess with intent to distribute, distribute, and aid and abet the distribution of at least 500 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(ii);

3. To possess with intent to distribute, distribute, and aid and abet the distribution of at least 280 grams of a mixture or substance containing a detectable amount of crack cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(iii);

4. To possess with intent to distribute, distribute, and aid and abet the distribution of at least 28 grams of a mixture or substance containing a detectable amount of crack cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(iii);

5. To possess with the intent to distribute, distribute, and aid and abet the distribution of at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii); and

6. To possess with the intent to distribute, distribute, and aid and abet the distribution of at least five grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(viii).

B. MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1. Defendants ESTRADA and ULLOA, and others known and unknown to the Grand Jury, would direct the drug trafficking activities of the L-13 gang, including the collection and distribution of "taxed" drug proceeds.

2. Defendants ULLOA, FACIO, NARIO, and J. MARTINEZ, and other drug suppliers, would obtain controlled substances that were then distributed to members and associates of the L-13 gang.

3. Defendants ESTRADA, ULLOA, NARIO, and J. MARTINEZ, and others known and unknown to the Grand Jury, would permit drug traffickers to distribute drugs in the geographic area controlled by the L-13 gang in return for a percentage of the drug proceeds that were sold in the areas controlled by the L-13 gang.

4. Defendants ESTRADA, ULLOA, FACIO, E. MARTINEZ, NARIO, SALAZAR, ARMENTA, S. RODRIGUEZ, J. MARTINEZ, VELARDEZ, M. HERNANDEZ, and HURTADO, and others known and unknown to the Grand Jury, would distribute controlled substances, including cocaine, crack cocaine, methamphetamine, and marijuana.

C. OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants ESTRADA, ULLOA, FACIO, E. MARTINEZ, NARIO, SALAZAR, ARMENTA, S. RODRIGUEZ, J. MARTINEZ, VELARDEZ, M. HERNANDEZ, and HURTADO, and others known and unknown to the Grand Jury, committed various overt acts, on or about the following times and dates, within the Central District of

California, and elsewhere, including, but not limited to, the following:

1. Paragraphs 4-6, 9, 11-22, 25-53 of Section B in Count One of this Indictment are hereby realleged as if fully set forth herein.

2. On or about July 1, 2009, defendant M. HERNANDEZ sold approximately .48 grams of crack cocaine to a confidential source ("CS4") in the vicinity of the 10500 block of Burl Avenue, in Los Angeles, California.

3. On or about July 8, 2009, defendant M. HERNANDEZ possessed approximately .40 grams of crack cocaine in the vicinity of the 10500 block of Burl Avenue, in Los Angeles, California.

4. On or about December 2, 2009, defendant SALAZAR sold approximately 1.5 grams of methamphetamine to a confidential source ("CS5") in the vicinity of Lennox Boulevard and Burl Avenue, in Los Angeles, California.

5. On or about December 9, 2009, defendant SALAZAR, in a telephone conversation using coded language, agreed to sell one ounce of methamphetamine to CS5 in exchange for $1200.

6. On or about December 9, 2009, defendants SALAZAR and S. RODRIGUEZ possessed approximately 30 grams of methamphetamine, and S. RODRIGUEZ possessed $1,530 in cash in the vicinity of Grevillea Avenue and 104th Street, in Los Angeles, California.

7. On or about February 22, 2010, defendant J. MARTINEZ, in a telephone conversation using coded language, agreed to sell approximately one ounce of methamphetamine to a confidential source ("CS7") in exchange for $1,300.

8. On or about February 25, 2010, defendant J. MARTINEZ, in a telephone conversation using coded language, agreed to sell approximately six ounces of methamphetamine to CS7 for $1300 per ounce.

9. On or about February 25, 2010, defendant J. MARTINEZ distributed approximately 27.3 grams of methamphetamine to CS7 in exchange for $1300 in the vicinity of Prairie Avenue and Hardy Street, in Inglewood, California.

10. On or about February 25, 2010, defendant VELARDEZ possessed approximately 31.5 grams of methamphetamine, a .45 caliber Smith & Wesson handgun, serial number N827136, and $1,120 in cash in the vicinity of Hardy Street and Prairie Avenue, in Inglewood, California.

11. On or about March 10, 2010, defendant HURTADO distributed approximately 1.7 grams of cocaine in the vicinity of Inglewood Avenue and 118th Street, in Los Angeles, California.

12. On or about March 12, 2010, defendant HURTADO possessed approximately 1.6 grams of cocaine and approximately .26 grams of methamphetamine in the vicinity of the 11900 block of Manor Drive, in Hawthorne, California.

13. On or about March 12, 2010, defendant HURTADO possessed approximately 7.8 grams of cocaine in the vicinity of Inglewood Avenue and 118th Street, in Los Angeles, California.

14. On or about April 2, 2010, in a telephone conversation using coded language, defendant J. MARTINEZ agreed to sell approximately six ounces of methamphetamine to CS7.

15. On or about April 2, 2010, defendant J. MARTINEZ possessed approximately 27.4 grams of methamphetamine in the

vicinity of the 105 Freeway and Hawthorne Boulevard, in Los Angeles, California.

16. On or about June 14, 2010, defendant M. HERNANDEZ, in a telephone conversation using coded language, discussed purchasing methamphetamine from an unindicted co-conspirator.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about December 9, 2009, in Los Angeles County, within the Central District of California, defendants DONALD SALAZAR, JR., also known as "Junior," and SANTIAGO LARIOS RODRIGUEZ knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 30 grams, of methamphetamine, a schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about January 27, 2010, in Los Angeles County, within the Central District of California, defendants BALDEMIRO ULLOA, also known as "Pana," and ALEJANDRO SEPULVEDA ARMENTA, also known as "Trini," knowingly and intentionally distributed at least five grams, that is, approximately 26.7 grams, of methamphetamine, a schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about February 25, 2010, in Los Angeles County, within the Central District of California, defendant JOE MARTINEZ, also known as "Scrappy," knowingly and intentionally distributed at least five grams, that is, approximately 22.7 grams, of methamphetamine, a schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about February 25, 2010, in Los Angeles County, within the Central District of California, defendant ROBERT VELARDEZ knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 31.5 grams, of methamphetamine, a schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about April 2, 2010, in Los Angeles County, within the Central District of California, defendant JOE MARTINEZ, also known as "Scrappy," knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 27.4 grams, of methamphetamine, a schedule II controlled substance.

FORFEITURE

[21 U.S.C. § 853]

1. The allegations contained in Count One of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging criminal forfeiture pursuant to the provisions of Title 21, United States Code, Section 853. Pursuant to Rule 32.2, Fed. R. Crim. P., the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 853, in the event any defendant is convicted under Count One of this Indictment. The assets of each convicted defendant that shall be subject to forfeiture include the following:

(a) any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense described in Count One;

(b) any property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense described in Count One; and

(c) a sum of money equal to the total value of the property described in subparagraphs 1.(a) and 1.(b) above.

2. Pursuant to Title 21, United States Code, Section 853(p), each defendant shall forfeit substitute property, up to the total value of the property described in subparagraphs 1.(a) and 1.(b), if, as the result of any act or omission of said defendant, said property, or any portion thereof, cannot be

located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson

ANDRÉ BIROTTE, JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

ELIZABETH R. YANG
Assistant United States Attorney
Chief, Violent & Organized Crime Section

PETER A. HERNANDEZ
Assistant United States Attorney
Deputy Chief, Violent & Organized Crime Section

XOCHITL D. ARTEAGA
Assistant United States Attorney
Violent & Organized Crime Section